## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF KANSAS

JULIE M. PARKER,                    )
                                    )
                 Plaintiff,         )     **CIVIL ACTION**
                                    )
v.                                  )     No.  04-1206-MLB
                                    )
LIFE CARE CENTERS OF AMERICA,       )
INC., d/b/a/ Andover Health         )
Care Center,                        )
                                    )
                 Defendant.         )
_____)

### AMENDED MEMORANDUM AND ORDER

This case comes before the court on Life Care's motion for summary judgment. (Doc. 70). The case has been fully briefed and is ripe for decision. (Docs. 71, 74, 75). Life Care's motion is granted in part and denied in part for the reasons herein.

## I.   FACTS

Defendant Life Care Centers of America, Inc. (Life Care) is licensed as an adult care home and classified by Kansas statute as a nursing facility. Plaintiff was hired on September 11, 2001, as a registered nurse (RN). At the time she was hired, plaintiff received a copy of Life Care's Employment Guidelines Handbook (handbook). Plaintiff signed an acknowledgment card for the handbook. A discipline and terminations policy is contained in the handbook. A portion of that policy reads as follows:

> Any group of people working together must abide by certain principles of conduct based on honesty, good taste and fair play. This is important to good working conditions. It is expected that all associates will conduct themselves in a manner consistent with common sense rules of behavior. Because all persons do not have the same ideas about appropriate conduct, it is necessary to adopt and

enforce rules that all can follow, ensuring that the expectations of other associates, the facility, and our residents are respected.

\* \* \*

This list that follows, though not all-inclusive, gives **examples** of violations of facility principles of conduct which may subject an offender to disciplinary action. Such action includes, but is not limited to, warning notices, suspension and/or discharge. The order in which they are listed does not reflect the importance or weight placed on any particular example.

\* \* \*

7. Threatening, fighting or engaging in any act of physical aggression (as well as any attempt or threat to engage in a fight or to provoke a fight), either by words or actions, or the use of abusive, or obscene language directed at a resident, supervisor, visitor or fellow associate which causes or is intended to cause a disruption of work or the peaceful atmosphere of the facility. [Emphasis in original.]

(Doc. 71 at 2-3, 5).

The disciplinary procedures policy is also explained in the handbook.

The facility has no desire to discipline any associate. Good management, however, demands that certain procedures are followed to correct or eliminate problems, since they can and do affect resident care. It is our assumption that most offenses are committed without forethought or destructive intent. However, a series of minor infractions suggests a continuing problem, and must be viewed as a source of major concern. The facility reserves the right, depending on the severity of the offense and the associate's history of other infractions, to terminate an associate after either the first or second offense. Generally, though, an associate will be subject to the following stages of progressive discipline:

1. First written warning.

2. Second written warning.

3. Suspension without pay, documented in the associate's file pending investigation. If investigation revealed no such offense occurred, the associate will be paid for the suspension period, will receive a formal apology from administration and will have the third offense and notice of suspension stricken from his/her personnel file. If the investigation substantiates the offense, the associate will be terminated.

-2-

> **This will be our usual and preferred process for administering discipline. However, conduct of any type which causes the center to lose confidence in your ability to perform adequately your assigned job may result in immediate discharge.** [Emphasis in original.]

(Doc. 71 at 6).

The handbook also has a disclaimer that states as follows:

> THIS HANDBOOK IS INTENDED AS A GUIDE FOR THE EFFICIENT AND PROFESSIONAL PERFORMANCE OF YOUR JOB. NOTHING HEREIN CONTAINED SHALL BE CONSTRUED TO BE A CONTRACT BETWEEN THIS FACILITY AND ITS ASSOCIATES. ADDITIONALLY, THIS HANDBOOK IS NOT TO BE CONSTRUED BY ANY ASSOCIATE AS CONTAINING BINDING TERMS AND CONDITIONS OF EMPLOYMENT. LIFE CARE RETAINS THE ABSOLUTE RIGHT TO TERMINATE ANY ASSOCIATE, AT ANY TIME, WITH OR WITHOUT GOOD CAUSE. LIFE CARE ALSO RETAINS THE RIGHT TO CHANGE THE CONTENTS OF THIS HANDBOOK AS IT DEEMS NECESSARY, WITH OR WITHOUT NOTICE.

(Doc. 71 at 4).

On March 11, 2002, plaintiff was diagnosed with scabies. On March 14, plaintiff informed Staci Swim, RN, that the only place she could have contracted scabies was at Life Care. Plaintiff also stated that it was a workers' compensation issue and that she believed other residents were infected. On March 18, Kelly Winter, Director of Training, informed plaintiff by written memo that no residents had scabies and plaintiff was ineligible for workers' compensation since scabies is a community-acquired illness. On the same day, plaintiff placed a hotline call to Life Care's Corporate Compliance Officer, Patrick Jordan. On the call, plaintiff reported her concerns about scabies and patient-staff ratios at the facility. Plaintiff then spoke personally with Jordan. Plaintiff believes that her report regarding scabies and patient-staff issues caused her to be branded as a "whistle-blower." As a result of the hotline call, Life Care conducted an investigation in which it reported to the Kansas

Department of Health and Environment that no residents or staff were infected with scabies. To the extent it is relevant, the evidence is undisputed that only plaintiff had scabies. Plaintiff claims that she attempted to file a workers' compensation claim based on scabies but did not do so when Winter told her it was not a workers' compensation issue. (Doc. 71 at 7-10).

On June 16, 2002, plaintiff advised Swim that she was having difficulties with co-workers who left the facility for smoke breaks. Life Care responded on June 24 by promoting plaintiff to house supervisor. On October 1, plaintiff received high scores on her annual review. Plaintiff received a merit raise based on this review. (Doc. 71 at 11-12).

Terri Lovell, Director of Nursing, received numerous complaints, most were undated, from plaintiff's co-workers regarding their difficulties during plaintiff's shifts. As a response to these complaints, Lovell met with plaintiff on November 18, 2002, January 13, March 30, and May 8, 2003. Winter also met with plaintiff in March 2003 to discuss the continuing problems on plaintiff's shifts. After March 30, 2003, Life Care received a complaint on April 6 regarding plaintiff forcing a patient to take pain medication and the concern that plaintiff was emotionally unstable, a complaint on April 13 that plaintiff was not helping out, a complaint on May 6 regarding staff conflicts with plaintiff and a complaint on May 25. Life Care did not discipline plaintiff after any of these complaints. Plaintiff generally denies that the events giving rise to the complaints occurred. (Docs. 71 at 13-16, exhs. F, G, H, I, J, K; 74 at 7-8).

On April 27, 2003, plaintiff was accidentally stuck on her left

-4-

hand with a used insulin syringe.  Life Care arranged for plaintiff to have an examination on April 29.  Plaintiff has tested negative for hepatitis and HIV.  Life Care filed a workers' compensation claim on plaintiff's behalf.  (Doc. 71 at 15).

On May 25, 2003, plaintiff filled out an Associate Corrective Action Form on Polly Jester and Chona Zlab, both Licensed Practical Nurses, for leaving the building to smoke without notifying licensed staff.  Lovell saw the forms on May 26.  Plaintiff had previously complained to Lovell and Swim about the amount of time staff left the building for smoke breaks.  (Doc. 74 at 13-14, 16-17).

Plaintiff was terminated on May 30, without having prior written discipline.  Life Care has immediately terminated other employees without warning for sleeping on the job.  Lovell can only recall two individuals who were terminated without following the discipline policy. (Docs. 71 at 6, exh. 5 at 55:17-21; 74 at 12).

Plaintiff filed suit against Life Care claiming that Life Care defamed her, breached an implied employment contract and fired her in retaliation for whistle-blowing and filing workers' compensation claims.  Life Care is seeking summary judgment on all claims.

**II.   SUMMARY JUDGMENT STANDARD: FRCP 56**

Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is "genuine" if sufficient evidence exists "so that a rational trier of fact could resolve the issue either way" and "[a]n issue is 'material' if under the substantive law it is essential to

-5-

the proper disposition of the claim." <u>Adler v. Wal-Mart Stores, Inc.</u>, 144 F.3d 664, 670 (10th Cir. 1998).  In determining whether a genuine issue of material fact exists, the court "view[s] the evidence in a light most favorable to the non-moving party." <u>Qwest Corp. v. City of Santa Fe, N.M.</u>, 380 F.3d 1258, 1265 (10th Cir. 2004) (quotation omitted).  Where, as here, a party seeks summary judgment regarding some, but not all, of the facts or issues in the case, Rule 56(d) authorizes the court to craft an order disposing of those issues for which there is no need for a trial.

## III. ANALYSIS

### A.   Whistle-blowing

Plaintiff asserts both a common law whistle-blowing claim and a statutory claim pursuant to the Kansas Risk Management Act (KRMA), K.S.A. 65-4921, et. seq.  Life Care responds that plaintiff's common law claim is precluded by the KRMA and that her KRMA claim must fail since she did not file a report in accordance with the statute.  A common law claim for whistle-blowing is precluded if a plaintiff has an adequate statutory remedy.  <u>See</u> <u>Goodman v. Wesley Medical Center, L.L.C.</u>, 276 Kan. 586, 594-95, 78 P.3d 817, 824 (2003).  In <u>Goodman</u>, the plaintiff asserted a common law claim of whistle-blowing since the Kansas Nurse Protection Act (KNPA) did not provide an adequate remedy. The Supreme Court concluded that the KRMA provides an adequate statutory remedy since it enhances the common law remedy.  <u>Id.</u> Accordingly, plaintiff's common law claim will be precluded if plaintiff has an adequate remedy under the KRMA.  The threshold question involves Life Care's status under the KRMA which, in turn, requires a tortured tour through various Kansas statutes.

1.   Life Care's status as a "medical care facility"

Plaintiff has alleged that she reported instances of under staffing, scabies and co-workers leaving the building to smoke.   In Goodman, the Supreme Court concluded that the KRMA "precludes common-law retaliatory discharge claims for reporting standard of care issues in medical care facilities." 276 Kan. at 594-95 (emphasis supplied). Life Care argues that it is not a medical care facility, which Kansas law defines as

> (1) A medical care facility licensed under K.S.A. 65-425 et seq. and amendments thereto; (2) a private psychiatric hospital licensed under K.S.A. 75-3307b and amendments thereto; and (3) state psychiatric hospitals and state institutions for the mentally retarded, as follows: Larned state hospital, Osawatomie state hospital, Rainbow mental health facility, Kansas neurological institute and Parsons state hospital and training center.

K.S.A. 65-4921(e).   See also K.S.A. 40-3401(m).

Life Care is not licensed under K.S.A. 65-425, but rather pursuant to K.S.A. 39-923 through 39-963, which govern nursing facilities.   Similar to the KNPA that was evaluated in Goodman, the statutes governing nursing facilities dictate how violations of the statutes must be reported, but do not provide an adequate remedy for whistle-blowing.   See K.S.A. 39-1403(b).   The statute states that "[n]o employer shall terminate the employment of . . . any employee solely for the reason that such employee made or caused to be made a report under this act."   Id.   However, unlike the KRMA, the statute does not provide a remedy for a violation.   Therefore, the provision in section 1403(b) is not an adequate statutory remedy.   See Goodman, 276 Kan. at 594-95.   Life Care is not a psychiatric hospital pursuant to section 4921(e)(2), (3).   Accordingly, Life Care is not a medical

care facility.

   2. If Life Care is not a medical care facility, is it a
   health care provider?

 While Life Care is not a medical care facility, the court still
may find that the KRMA precludes any common law claims if plaintiff
and/or Life Care fall within the definition of a health care provider
and either or both were required to report standard of care issues.

 For purposes of K.S.A. 65-4921 through 65-4930, a "health care
provider" includes persons and entities defined under K.S.A. 40-
3401(a) and amendments as well as professional nurses and practical
nurses licensed by the board of nursing.  Plaintiff is such a nurse.
K.S.A. 40-3401(f) is a poorly-drafted definition which, at first
reading, seems to name every sort of health care provider except witch
doctors and faith healers.  Included in its definition is "a Kansas
not-for-profit corporation organized for the purposes of rendering
professional services by persons who are health care providers under
this section . . ."  Neither plaintiff nor Life Care has presented
uncontroverted evidence which would allow the court to conclude as a
matter of Kansas law that Life Care is a health care provider.  The
court has no evidence of Life Care's corporate status for purposes of
K.S.A. 40-3401(f).  Presumably, Life Care, Inc., is a corporation, but
the statute requires that a health care provider is a not-for-profit
corporation.  The court cannot conclude that Life Care meets that
definition.  Accordingly, the KRMA cannot preclude plaintiff's common
law claim of retaliation for reporting claims against Life Care since
the reporting statutes evidently do not apply to Life Care because it
is not a medical care facility or health care provider.

-8-

3.   Does plaintiff still have a statutory remedy?

Our trip through Kansas statutes does not end here because the KMRA reporting statute, K.S.A. 65-4923(a), states:

> If a health care provider, or a medical care facility agent or employee who is directly involved in the delivery of health care services, has knowledge that a health care provider has committed a reportable incident, such health care provider, agent or employee shall report such knowledge as follows:
>
> (1) If the reportable incident did not occur in a medical care facility, the report shall be made to the appropriate state or county professional society or organization, which shall refer the matter to a professional practices review committee duly constituted pursuant to the society's or organization's bylaws. The committee shall investigate all such reports and take appropriate action. The committee shall have the duty to report to the appropriate state licensing agency any finding by the committee that a health care provider acted below the applicable standard of care which action had a reasonable probability of causing injury to a patient, or in a manner which may be grounds for disciplinary action by the appropriate licensing agency, so that the agency may take appropriate disciplinary measures.

The reader will recall that registered and licensed practical nurses meet the statutory definition of "health care provider." K.S.A. 40-3401(f).   Thus, following the logic of <u>Goodman</u>, if plaintiff's complaints fall within the KRMA, then she is precluded from asserting a common law claim for retaliation since the statutory remedy is adequate.   Plaintiff has presented evidence that she made a complaint on May 25, 2003, against Jester and Zlab, both LPNs, for leaving the building to smoke without notifying licensed staff. Plaintiff has also testified that she made a similar complaint against LPN Windsor.   (Doc. 74 exh. 3 at 4).   Plaintiff, however, fails to state the time period of the complaint against Windsor.

Plaintiff was required make a report in accordance with the KRMA if the LPNs' actions constituted a reportable incident.   A reportable

-9-

incident occurs when "an act by a health care provider . . . [that] [i]s or may be below the applicable standard of care and has a reasonable probability of causing injury to a patient; or may be grounds for disciplinary action by the appropriate licensing agency." K.S.A. 65-4921(f).   Neither party disputes that the LPNs' actions would be below the standard of care.   Therefore, plaintiff's claims for retaliation for reporting her co-workers can be asserted under the KRMA.  But wait . . .

K.S.A. 65-4928 states that "[n]o employer shall discharge or otherwise discriminate against any employee for making any report pursuant to K.S.A. 65-4923 or 65-4924."   Pursuant to K.S.A. 65-4923(a), supra at 9, plaintiff was required to make the report "to the appropriate state or county professional society or organization." Plaintiff did not do so.  Plaintiff reported the incidents internally. K.S.A. 65-4924 pertains to reports relating to impaired providers and is not pertinent.   Accordingly, plaintiff is only protected by the provisions of the KRMA if she reported an incident in accordance with the statute.   She did not and therefore, Life Care's motion for summary judgment on the basis of plaintiff's claims of retaliation for filing complaints against the LPNs is granted.

4.  Plaintiff's common law claim

So, is plaintiff's whistle-blower retaliatory discharge claim dead in the water? Not yet.  Her common law claim against Life Care[1]

---

[1] Plaintiff also argues in her response that she should be entitled to assert a common law claim for violations she reported against individuals who are not LPNs, i.e. the CNAs.  (Doc. 74 at 20). However, the evidence presented by plaintiff is that she made specific complaints regarding Jester, Zlab and Windsor.  While plaintiff has insisted that CNAs were part of the smoking group, she has not

is still alive, if she can meet her burden of proof.

> To establish a retaliatory discharge claim for whistle-blowing, a plaintiff has the burden of proving the following elements by clear and convincing evidence: "[A] reasonably prudent person would have concluded the employee's co-worker or employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare; the employer had knowledge of the employee's reporting of such violation prior to discharge of the  employee; and the employee was discharged in retaliation for making the report."  In addition, the employee must prove that any whistle-blowing was done in good faith based on a concern regarding the wrongful activity reported rather than for a corrupt motive like malice, spite, jealousy, or personal gain.
> The employee must first establish a prima facie case. If that is done, the employer then bears the burden of producing evidence that the employee was terminated for a legitimate nondiscriminatory reason. If that takes place, the burden then shifts back to the employee to produce evidence that the employer's motives were pretextual. To avoid summary judgment, the employee must assert specific facts disputing the employer's motive for termination.

Goodman, 276 Kan. at 589-90 (internal citations omitted).

Plaintiff has failed to make out her prima facie case.  To succeed on a claim for retaliation, plaintiff must establish that she reported to management that Life Care was "engaged in any activities in violation of rules, regulations or the law pertaining to public health, safety, or general welfare."  Conrad v. Board of Johnson County Com'rs, 237 F. Supp.2d 1204, 1267 (D. Kan. 2002).  Plaintiff's complaints on May 25 were directed at Jester and Zlab individually and do not allege that the LPNs violated any identified law, regulation or rule.  The report wholly lacks any alleged violation as to Life Care.  Since plaintiff's complaint fails to allege that Life Care

---

demonstrated to the court that she specifically complained about an individual CNA. Accordingly, she cannot assert a common law claim for retaliation based on alleged complaints made against the CNAs.

violated a regulation, rule or law, plaintiff's common law whistle-blowing claim based on her complaint about the LPNs cannot survive summary judgment.

But what about plaintiff's 2002 complaint to the corporate compliance officer that a scabies outbreak occurred at the facility and that Life Care was understaffed?  Plaintiff has failed to submit any evidence that her report alleged any violation of rules, regulations or the law.  The court is not prepared to conclude as a matter of law that an outbreak of a contagious infection is somehow a violation of rules, regulations or the law on Life Care's part, quite apart from a complete lack of evidence that such an outbreak occurred.  Moreover, plaintiff's complaints about under staffing are more adequately "characterized as a workplace dispute or taking a stand on a patient care issue rather than a report bringing to light illegal conduct.  Workplace discussions and disagreements do not give rise to whistle-blower claims unless the plaintiff actually reports illegal conduct by the employer."  <u>Id.</u>  The facts demonstrate that plaintiff was frustrated with certain co-workers' use of their fifteen-minute breaks.  However, these facts cannot be interpreted to a report regarding illegal conduct by Life Care.   In short, there is no evidence that plaintiff actually "reported" Life Care's violation of a rule, regulation, or law, let alone "clear and convincing evidence" of such a reporting.

Life Care's motion for summary judgment on plaintiff's whistle-blowing retaliation claim is granted.

**B.   Workers' Compensation**

Plaintiff asserts that she was terminated in retaliation for

-12-

filing and/or sustaining a workers' compensation injury.  Plaintiff inquired about workers' compensation from Life Care for her scabies infection and the needle prick.[2]   The elements for a claim of retaliatory discharge for filing a workers' compensation claim are:

> (1) The plaintiff filed a claim for workers compensation benefits or sustained an injury for which he or she might assert a future claim for such benefits; (2) the employer had knowledge of the plaintiff's workers compensation claim injury; (3) the employer terminated the plaintiff's employment; and (4) a causal connection existed between the protected activity or injury and the termination.

Rebarchek v. Farmers Co-op. Elevator, 272 Kan. 546, 553-54, 35 P.3d 892, 898-99 (2001).

Plaintiff asserts that she has satisfied the first element since she sustained an injury, scabies, for which she might claim benefits.  Life Care responds that the injury was not work related.   In explaining the expansion of the first element to include future claims, the Supreme Court stated that "even where the employee had not yet filed a workers compensation claim, an employer is prohibited from firing an employee who is absent from work due to a work-related injury and who might file a workers compensation claim." Ortega v. IBP, Inc., 255 Kan. 513, 516, 874 P.2d 1188, 1191 (1994). Nevertheless, plaintiff still must establish that her injury was work-related and, therefore, eligible to receive benefits in the event that she submitted a claim.  Plaintiff has failed to do so.  Plaintiff was

---

[2] Life Care asserts that plaintiff should be precluded from asserting this claim based on her scabies infection since plaintiff failed to include this allegation in the complaint.  (Doc. 71 at 37). However, this allegation is in the pretrial order.  D. Kan. R. 16.2(c) clearly states that the pretrial order controls the subsequent course of the action.   Life Care should have objected to plaintiff's allegations before the pretrial order was filed.

the only person in the entire facility who had acquired scabies. Plaintiff has not presented any evidence, other than her belief, that she became infected while working at Life Care. It is plaintiff's burden to establish her prima facie case and she has failed to do so. Robinson v. Wilson Concrete Co., 913 F. Supp. 1476, 1484 (D. Kan. 1996).

Plaintiff next asserts that her termination was in retaliation for her needle prick injury. Life Care concedes that the first three elements have been met. Life Care, however, argues that plaintiff has failed to establish a causal connection between her injury and termination.

> Employers rarely admit to retaliatory intent, and plaintiffs must ordinarily rely on circumstantial evidence to prove a prima facie case of retaliatory discharge. Proximity in time between the claim and discharge is a typical beginning point for proof of a causal connection. Close temporal proximity between a workplace injury or the filing of a workers compensation claim and the adverse employment action may be "highly persuasive evidence of retaliation."

White v. Tomasic, 31 Kan. App.2d 597, 602, 69 P.3d 208, 212 (2003) (internal citations omitted). Plaintiff's injury occurred approximately thirty-three days prior to her termination. The court finds that the close proximity between plaintiff's injury and her termination is sufficient to make out a "beginning point" of a causal connection. See Rebarchek, 272 Kan. at 555; Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999)(one and one-half month period is sufficient).

Since workers' compensation retaliatory discharge cases are analyzed under a burden-shifting approach, Rebarchek, 272 Kan. at 553, the burden now shifts to Life Care to show an articulate, non-

-14-

retaliatory reason for the discharge.  <u>Bausman v. Interstate Brands Corp.</u>, 252 F.3d 1111, 1116 (10th Cir. 2001).  "If the employer meets this burden, the burden shifts back to the plaintiff but the plaintiff must show clear and convincing evidence that he or she was terminated in retaliation for exercising rights under the Workers' Compensation Act."  <u>Id.</u>

Life Care has established by sufficient evidence that its non-retaliatory legitimate reason for terminating plaintiff was her lack of supervisory skills and numerous complaints filed by plaintiff's co-workers.  Since Life Care has carried its "burden of production, the presumption raised by the prima facie case is rebutted, [and] drops from the case."  <u>Robinson v. Wilson Concrete Co.</u>, 913 F. Supp. 1476, 1483 (D. Kan. 1996).  The burden now returns to plaintiff.

Plaintiff has simply responded that the close proximity in time of the needle stick, coupled with Life Care's prior determination to deny workers' compensation on her scabies claim, demonstrates that Life Care is hostile towards workers' compensation claims.  First, as discussed previously, plaintiff has failed to produce any evidence that her scabies claim was a work-related injury.  Second, plaintiff must come forward with clear and convincing evidence that her termination was the result of her injury.  Plaintiff has failed to do so.  Life Care immediately responded to the needle stick injury by providing prompt medical care, reporting the injury to its health care provider and filing a workers' compensation claim.[3]  There is no

---

[3] In fact, plaintiff did file a claim for workers' compensation for the needle prick injury on June 5, 2003.  (Doc. 71, exh. 19). Neither party, however, have offered evidence of the result of plaintiff's claim.

evidence that Life Care has discouraged any claims for workers' compensation when those claims were a result of a work-related injury. "Timing alone, without any other evidence of retaliation, does not comport with the standard of proof for a retaliatory discharge claim in Kansas." Robinson, 913 F. Supp. at 1484.

Life Care's motion for summary judgment on plaintiff's claim for workers' compensation retaliatory discharge is granted.

### C.   Defamation

Plaintiff asserts that she was defamed by Life Care's publication of the complaints made by her co-workers.  To establish a claim for defamation, plaintiff must show that "(1) false and defamatory words (2) [were] communicated to a third person (3) which result in harm to the reputation of the person defamed." Lloyd v. Quorum Health Resources, L.L.C., 31 Kan. App.2d 943, 952, 77 P.3d 993, 1000 (2003).

> In any proceeding where the plaintiff complains that he or she has been defamed, a number of affirmative defenses are available, among them privilege and truth. Whether a privilege is available in an action for defamation must be determined based on the status of the particular defendant and the content of the alleged defamatory communication. . . . A qualified or limited privilege is granted to those with a special interest or duty in the subject matter of the communication. . . . **One such qualified privilege exists with respect to business or employment communications made in good faith and between individuals with a corresponding interest or duty in the subject matter of the communication.** The question whether or not a publication is privileged is a question of law to be determined by the court. Where a defamatory statement is made in a situation where there is a qualified privilege the injured party has the burden of proving not only that the statements were false, but also that the statements were made with actual malice--with actual evil-mindedness or specific intent to injure.

Turner v. Halliburton Co., 240 Kan. 1, 7-8, 722 P.2d 1106, 1112-13 (1986)(internal citations omitted)(emphasis supplied).

-16-

Life Care responds that the communications were not published to a third party and/or qualify as privileged statements. Since the Kansas Supreme Court has affirmed the appellate court's determination that "remarks communicated by one corporate employee to another concerning the job performance of a third employee are publication for purposes of a defamation action against the employer," Luttrell v. United Telephone System, Inc., 9 Kan. App.2d 620, 623, 683 P.2d 1292 (1984), aff'd, 236 Kan. 710, 695 P.2d 1279 (1985), the court will proceed to determine whether the intercompany remarks were privileged.

"The essential elements of a qualifiedly privileged communication are good faith, an interest to be upheld, a statement limited in its scope to the upholding of such interest and publication in a proper manner only to proper parties." Dobbyn v. Nelson, 2 Kan. App.2d 358, 360, 579 P.2d 721, 723 (1978). Plaintiff has failed to provide any evidence that the complaints made by her co-workers were not made in good faith. The statements were made to address concerns that staff had with plaintiff's job performance. The employees had an interest in the residents and their care. All statements were made to the employee's supervisor. The complaints were limited in their scope to upholding the interest involved and publication of the complaints by the co-workers were limited to the immediate supervisor. On one occasion, Lovell informed Laura Richardson, Executive Director of the facility, about the complaint that plaintiff was mentally or emotionally unstable. There is no evidence that plaintiff's supervisor, Lovell, relayed the complaint to Richardson in bad faith. Certainly, as director of the facility, Richardson had an interest in ensuring that her staff was emotionally stable. Accordingly, the

court finds that the complaints were privileged.  See Turner, 240 Kan. at 10.  ("Employee conduct, particularly involving theft, is a matter within the bounds of the qualified privilege pertaining to communications within the company.")

Since the communications were privileged, plaintiff must "offer evidence of an extrinsic character to prove actual malice."  Id. at 8.  The Kansas pattern instructions define actual malice: "Proof of actual malice requires a plaintiff to prove that the (communication) (publication) was made with knowledge that the defamatory statement was false or with reckless disregard of whether it was false or not and that it was made with actual evil-mindedness or specific intent to injure." PIK-Civil 3d 127.53 (2005 Supp.).  Plaintiff simply offers that "no one can argue that the accusations made against Plaintiff in this case including that she had stolen Morphine, are anything other than statements made with specific intent to injure."  Doc. 74 at 33. Plaintiff has completely failed to establish that the employees knew the statements were false or made them with reckless disregard and that they were made with actual evil-mindedness or specific intent to injure.

The evidence, when viewed in a light most favorable to plaintiff, is insufficient to establish the existence of extrinsic evidence to prove actual malice.  Life Care is entitled to summary judgment on plaintiff's defamation claim.

### D.   Implied Contract

Finally, plaintiff asserts a claim for breach of an implied contract of employment.  Absent an express or implied contract, Kansas law presumes employment to be at will.  See Nguyen v. IBP, Inc., 905

F. Supp. 1471, 1486 (D. Kan.1995); <u>Inscho v. Exide Corp.</u>, 29 Kan. App.2d 892, 895, 33 P.3d 249, 252 (2001).  An implied contract of employment arises from facts and circumstances showing mutual intent to contract. <u>Kastner v. Blue Cross & Blue Shield of Kansas, Inc.</u>, 21 Kan. App.2d 16, 23, 894 P.2d 909, 915 (1995).  The intent of the contracting parties is normally a question of fact for the jury, and existence of an implied contract of employment requires a factual inquiry. <u>Frye v. IBP, Inc.</u>, 15 F. Supp.2d 1032, 1044.  Factors to be considered in determining whether the parties had a mutual intent to contract include the understanding and intent of the parties, which are ascertainable from written and oral negotiations, the conduct of the parties, the usages of the business, the situation and objective of the parties giving rise to the relationship, the nature of the employment, and any other circumstances surrounding the employment relationship which would tend to make clear the intention of the parties at the time the employment relationship commenced.  <u>Id.</u> at 1044-45 (citations omitted). The parties must have a mutual intent to enter into an employment contract; plaintiffs' unilateral expectations of continued employment are insufficient to create a contract.  <u>Panis v. Mission Hills Bank, N.A.</u>, 60 F.3d 1486, 1492 (10th Cir. 1995).

Plaintiff asserts that she has an implied contract for continued employment which cannot be terminated without Life Care adhering to the grievance policy.  While the policy in the handbook states that employment can be terminated at any time, plaintiff has stated in a post-deposition affidavit that "soon after I was hired at Andover, I was told that employees could not be terminated without going through the steps of progressive discipline provided in the handbook." (Doc.

74, exh. 3 ¶ 2).[4]  The written grievance policy was not followed in plaintiff's termination.  Because the existence of an implied contract is a question of fact for the jury, Life Care's motion for summary judgment with respect to this claim is denied.  See <u>Koehler v. Hunter Care Centers, Inc.</u>, 6 F. Supp.2d 1237, 1242-43 (D. Kan. 1998)("Although the handbooks contained disclaimers that the handbook was not to be construed as a contract and that employees could be terminated at will, such disclaimers are insufficient to resolve the issue as a matter of law" when plaintiff has presented evidence that superiors indicted that grievance policy was to be followed.)

## IV.  CONCLUSION

Life Care's motion for summary judgment on plaintiff's claims for retaliation and defamation are granted.  Life Care's motion for summary judgment on plaintiff's claim for breach of implied contract is denied.

---

[4] In its reply, Life Care asserts that plaintiff's "self-serving affidavit . . . is inadmissible or non probative evidence" which must be disregarded, citing <u>Phillips v. Calhoun</u>, 956 F.2d 949, 951 (10th Cir. 1992) and two cases from this district.  Life Care misses the legal point here.  Affidavits are admissible in summary judgment proceedings, Fed. R. Civ. P. 56, and the affidavit of a party is almost always "self-serving."  Life Care has submitted the affidavit of Terrie Lovell, its Director of Nursing, in support of its motion. Is not Lovell's affidavit "self-serving" of Life Care's interest? Certainly it is.  Of course, any affidavit must contain material information which would be admissible in evidence.  Plaintiff's averment that she "was told" may, or may not, meet this requirement. The affidavit does not identify the person who "told" plaintiff.  If it was a person who had the authority to speak for Life Care (e.g. Ms. Lovell) that is one thing.  If it was a maintenance person, that is another.  Neither party points to deposition testimony which would clarify this statement and the court is under no obligation to search the record for it.  Similarly, while plaintiff's affidavit was prepared <u>after</u> her deposition was taken, Life Care does not raise a <u>Franks v. Nimmo</u>, 796 F.2d 1230, 1237 (10th Cir. 1986) objection and it is too late to do so in a motion for reconsideration.

A motion for reconsideration of this order pursuant to this court's Rule 7.3 is not encouraged.  The standards governing motions to reconsider are well established.  A motion to reconsider is appropriate where the court has obviously misapprehended a party's position or the facts or applicable law, or where the party produces new evidence that could not have been obtained through the exercise of reasonable diligence.  Revisiting the issues already addressed is not the purpose of a motion to reconsider and advancing new arguments or supporting facts which were otherwise available for presentation when the original motion was briefed or argued is inappropriate.  Comeau v. Rupp, 810 F. Supp. 1172 (D. Kan. 1992).  Any such motion shall not exceed three pages and shall strictly comply with the standards enunciated by this court in Comeau v. Rupp.  The response to any motion for reconsideration shall not exceed three pages.  No reply shall be filed.

IT IS SO ORDERED.

Dated this __31st__ day of March 2006, at Wichita, Kansas.


s/ Monti Belot
Monti L. Belot
UNITED STATES DISTRICT JUDGE

-21-